UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ERALD ALIMEHMETI,

Defendant.

25 Cr. 120 (AT)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN SUPPORT OF ITS MOTIONS *IN LIMINE***

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Jane Y. Chong
Chelsea L. Scism
Assistant United States Attorneys
*Of Counsel*

# TABLE OF CONTENTS


BACKGROUND .... 2

I. Offense Conduct .... 2

II. Procedural History .... 7

ARGUMENT .... 8

I. The Defendant's Statements and Statements of Others Necessary to Understand the Defendant's Statements Are Admissible .... 8

A. Applicable Law .... 9

B. Discussion .... 10

II. Evidence of the Defendant's Albanian Criminal History and His Brother's Federal Conviction Are Admissible to Demonstrate that the Defendant Was the User of Certain Online Accounts .... 13

A. Relevant Facts .... 13

B. Applicable Law .... 17

C. Discussion .... 18

III. Evidence of the Defendant's Belief That He Was Under Law Enforcement Surveillance Is Admissible .... 21

IV. Evidence of Terrorist Propaganda Materials Possessed or Disseminated by The Defendant Is Admissible .... 24

A. Relevant Facts .... 25

B. Applicable Law .... 28

C. Discussion .... 31

V. The Court Should Take Judicial Notice of ISIS as an FTO .... 38

VI. Evidence of Tactical Equipment the Defendant's Friend Purchased at the Defendant's Direction Is Admissible .... 39

A. Relevant Facts .... 40

B. Discussion .... 40

VII. Evidence of the Section 2332a Conspiracy Is Admissible .... 43

A. Relevant Facts ........ 44

B. Applicable Law ........ 44

C. Discussion ........ 45

VIII. The Defendant Cannot Admit His Own Statements Absent a Hearsay Exception or Other Evidentiary Basis ........ 47

IX. The Court Should Preclude Cross-Examination on the Unrelated Investigative Work of the OCE and CHSes ........ 49

X. Evidence or Argument Concerning the Punishment or Consequences the Defendant Will Face If Convicted Should Be Precluded ........ 50

CONCLUSION ........ 51

The Government respectfully submits this memorandum in support of its motions *in limine* seeking the following pretrial rulings in advance of the December 7, 2026 trial of defendant Erald Alimehmeti ("Alimehmeti" or "the defendant"):

(1) Admitting the defendant's statements and statements of others that are necessary to understand the defendant's statements;

(2) Admitting evidence of the defendant's Albanian criminal history and his brother's federal conviction for the limited purpose of demonstrating that the defendant was the user of certain online accounts;

(3) Admitting evidence of the defendant's belief that he was under law enforcement surveillance;

(4) Admitting evidence of Islamic State of Iraq and al-Sham ("ISIS") propaganda that the defendant possessed and/or disseminated;

(5) Taking judicial notice of ISIS as a U.S.-designated foreign terrorist organization ("FTO");

(6) Admitting evidence of tactical equipment the defendant's friend purchased at the defendant's direction;

(7) Admitting evidence that another individual obtained materials disseminated by the defendant and used them to conspire to commit bombings against U.S.-based targets;

(8) Precluding the defendant from offering his own statements absent a hearsay exception or other evidentiary basis;

(9) Precluding cross-examination of an undercover officer and confidential source about their unrelated investigative work; and

(10) Precluding evidence and argument concerning the potential punishment or consequences that the defendant will face if convicted.

## BACKGROUND

### I. Offense Conduct

The defendant, a dual citizen of the United States and Albania, and an Albanian resident, served two terms of imprisonment in Albania from August 2015 to May 2019, and again from November 2020 to July 2022. In between these prison terms, using numerous different accounts across different online platforms, the defendant disseminated ISIS propaganda (the "Terrorist Propaganda Materials"); training materials; bomb-making videos and articles; and detailed instructions of how to make and deploy chemical weapons, destructive devices, and other explosives, to other individuals whom the defendant believed shared his violent extremist ideology and desire to plan attacks against innocent civilians who did not practice Islam, either at all, or in the precise way the defendant believed they should.

The people with whom the defendant shared his materials and resources included, among others, an FBI confidential human source ("CHS-1"), an FBI online covert employee ("OCE"), and an individual named Kristopher Matthews. CHS-1 operated an online persona whose backstory was that he traveled to Syria and Iraq to join ISIS and later moved to Germany. As described in more detail below, Matthews was an ISIS supporter who was subsequently prosecuted and convicted in the United States District Court for the Western District of Texas for conspiracy to provide material support to ISIS. Matthews received certain Terrorist Propaganda Materials from the defendant, including bomb-making videos, and disseminated that material to another FBI confidential human source ("CHS-2"), and conspired to use explosives to target U.S. government property. During this period, the defendant communicated online with CHS-1, and distributed materials to the OCE, Matthews and others, about different methods of killing individuals, who the defendant called "kuffar," *i.e.*, nonbelievers of Islam; complained about being monitored by law enforcement for terrorism; discussed his operational plans for various attacks; tried to recruit

others to join him; and sought assistance in acquiring tactical vests, rifle modifications, and other equipment for his “ops.”

For example, in approximately December 2019, using the moniker “KPMC” on Telegram, the defendant described in detail to CHS-1 how to mix sticky napalm and white phosphorus, put the chemicals into a tanker, and spray them into a crowd of civilians at a concert. (the “Napalm/White Phosphorus Chat”). Specifically, the defendant told CHS-1:

> You can melt styrofoam in acetone (I know how dola[1] likes their acetone) or in boiled gasoline, that will create a very sticky napalm like substance, or you can mix acetone or benzene and toothpaste, many ways to make a sticky flammable substance
>
> Put it inside a tanker with a hose like a firetruck
>
> And you’ve got a napalm flamethrower
>
> Or white phosphorus, also easy, matchbox contains red phosphorus, the red striker strip on box has red phosphorus, you extract it via acetone, you then heat the red phosphorus and you get white phosphorus. White phosphorus ignites in contact with oxygen, our air
>
> It can also be turned into poisonous gas
>
> But you can mix white phosphorus with disulphide to keep it from igniting. You can put [it] into a tanker and spray large crowds in concerts and they wont even know what happened giving you time to stay icognito [sic] and get away, when the sulphide dries
>
> The white phosphorus spontaneously will ignite in contact with air lighting every kaffir[2] on fire.
>
> . . .

---

1 “Dola,” also spelled “Dawla” and “Dawlah,” is a transliteration of the colloquial or shortened Arabic term used to refer to ISIS.

2 “Kaffir” or “kuffar” are common transliterations of the Arabic word meaning disbelievers or infidels.

> This is for darul kufr ops but also ops un darul Islam[3]
>
> . . .
>
> Imagine in the concerts thousands of people, theyrr [sic] used to getting sprayed with water and crap, so you spray them and no one thinks any thing. You leave, then after a while the sulphide dries up leaving only white phosphorus which immediately combusts into flames immediately
>
> The horror
>
> Best part is the more they touch it the more it burns and if they throw water on it it reacts even more violently
>
> And if they survive the toxicity in their skin will kill them. Its [sic] highly toxic
>
> The styrofoam idea is easier but youd [sic] have to change the smell so no one notices till [sic] theyre [sic] on fire
>
> First tankers sprays [sic] goo and then all it would take it one match and people would light each other up by bumping into one another
>
> The explosives research i [sic] did has made me a madman

During another Telegram chat between CHS-1 and the defendant in approximately January 2020, the defendant, using the moniker "CASEVAC ETA 10MIKS," shared with CHS-1 that he wanted to find "brothers" to participate in a particular "op." After CHS-1 said, in sum and substance, that he had found people for the operation, the defendant told CHS-1 to "make a group with these guys and lets talk to them." CHS-1 subsequently created a Telegram group called "SOGRU" (the "SOGRU Chat") in which CHS-1 invited the defendant and two purported "brothers." Between at least January 15 and January 20, 2020, the SOGRU Chat was active and the defendant described for the other participants some degree of information about his "op."

---

[3] These appear to be references to "Dar al-Kufr" and "Dar al-Islam," terms used to describe regions where the laws are not based on Islamic law and regions where Islamic law prevails, respectively.

Specifically, the defendant asked for the chest, weight, waist, height, and hip measurements from the other SOGRU Chat participants "for the gear." When asked what kind of gear he was getting, the defendant said, "Vests, wetsuits, battlebelts,[4] and uniforms[.]" When asked why they would need wetsuits, the defendant replied, "To keep warm without restricting our movement by not wearing a lot of layers. Also warm when wet." The defendant clarified that they would not be swimming "unless we have to bro[.]"

Between approximately 2020 and 2021, the defendant reached out to a high school friend ("Individual-1") living in the Bronx to request that Individual-1 procure for the defendant similar equipment to that described in the SOGRU Chat. Individual-1 received text messages from the defendant asking Individual-1 to purchase a variety of items for the defendant, such as a tactical vest, magazine pouches for holding ammunition, a pistol grip, and firearms optics accessories, as well as a spreadsheet detailing the quantities the defendant wanted and online links through which the items could be purchased. In or about September 2020, the defendant sent money to Individual-1 to pay for the purchase of the requested items, and Individual-1 bought some of them and kept them stored. In or about 2024, after he was released from Albanian prison for the second time, the defendant sent more messages to Individual-1 about his requested equipment. In one such message from approximately July 7, 2024, the defendant wrote, "Why u deleted last chat woth [sic] links [slur] I hadn't saved those." In approximately December 2024, the FBI collected the defendant's equipment from Individual-1, which included a wetsuit—as described by the defendant in the SOGRU Chat—a riflescope, a red dot sight (which can be used to aim a firearm), and a grip for an AK-47.

[4] A battle belt is a padded belt made to hold ammunition, firearms, and other tactical gear related to weaponry.

Separately, the defendant operated several "channels" on Telegram, all of which were named some variation of the word "inghimasi" (the "InGhimasi Channels").[5] On each of these channels, the defendant was the administrator, giving him the ability to share messages, photos, videos, and files with his subscribers. On the InGhimasi Channels, the defendant compiled and disseminated to his subscribers dozens of videos and instructional materials that he described as "training materials" imparting "basic skills you will need to operate as a solder." The defendant further told his subscribers, among other things, that the defendant's materials would show them "[w]ays to operate as an untraceable asset of the Khalifa[6] in Darul Harb,"[7] and that "the kuffar are your targets[.]" The defendant's training materials included, among other things, how to operate AK-47 and M16 rifles and Glock pistols; how to "react when the enemy is shooting at you;" how to conduct urban operations; how to render aid during combat ("The Khalifa at its peak in 2014 reported a need for people with this type of skill"); and how to manufacture improvised explosives and chemical weapons, including white phosphorus and TATP[8], among several others. The defendant also shared with his InGhimasi Channel subscribers, among other materials, an infamous ISIS propaganda video called "So Fight Them Muwahid," containing step-by-step

[5] "Inghimasi" is a transliteration of an Arabic term that refers to militants employed by ISIS and other jihadist extremist groups to conduct suicide attacks.

[6] "Khalifa" refers to the Caliphate, or the Islamic State.

[7] "Darul Harb" refers to regions whose governments or laws are not governed by Islamic or sharia law.

[8] "TATP," which refers to a triacetone tricerperoxide-based explosive, has been described in the media as ISIS's "signature" explosive and was used in, among other attacks, the 2016 Brussels and 2017 Manchester Arena bombings. *See* Neil Collier et. Al, A Signature ISIS Explosive in Europe, *available at* http://www.nytimes.com/video/world/Europe/100000004281038/isis-signature-explosive-in-europe.html.

instructions for making a TATP explosive (the "ISIS TATP Video"). Below is a screenshot of the video posted by the defendant and the defendant's accompanying description of the video:




In November 2024, the defendant flew from Albania to Newark Liberty International Airport and went directly to the Bronx, New York, where he was arrested by the FBI. On the day of his arrest, the defendant had a USB drive containing numerous Terrorist Propaganda Materials.

## II. <u>Procedural History</u>

On March 21, 2025, the defendant was charged in a two-count indictment (the "Original Indictment") with: (1) attempted provision of material support and resources to a designated FTO, ISIS, in violation of 18 U.S.C. §§ 2339B, 3238, and 2 ("Original Count One"); and (2) distribution of information relating to explosives, destructive devices, and weapons of mass destruction, in violation of 18 U.S.C. §§ 842(p), 3238, and 2 ("Original Count Two"). On October 5, 2026, following the defendant's motion to dismiss Original Count Two and the Government's representation to the Court that the Government did not intend to proceed to trial on that charge, the Court dismissed Original Count Two.

On November 5, 2026, the defendant was charged in a two-count superseding indictment (the "S1 Indictment") with: (1) provision and attempted provision of material support and resources for acts of terrorism, namely (a) using, threatening, and attempting or conspiring to use, a weapon of mass destruction, in violation of 18 U.S.C. § 2332a; (b) bombing and attempting to bomb places of public use, government facilities, public transportation systems, and infrastructure facilities, in violation of 18 U.S.C. § 2332f; and (c) using, threatening, and attempting to use and to cause another to use any chemical weapon, and assisting and inducing, in any way, any person to do so, in violation of 18 U.S.C. § 229; all in violation of 18 U.S.C. §§ 2339A, 3238, and 2 ("S1 Count One"); and (2) development, production, and use of chemical weapons, attempting to do so, and assisting and inducing, in any way, any person to do so, in violation of 18 U.S.C. §§ 229, 3238, and 2 ("S1 Count Two").

As set forth in the Government's letter dated November 7, 2026, the Government intends to proceed at trial on all three pending charges: Original Count One, S1 Count One, and S1 Count Two.

## ARGUMENT

### I. The Defendant's Statements and Statements of Others Necessary to Understand the Defendant's Statements Are Admissible

At trial, the Government intends to offer evidence of the defendant's out-of-court statements primarily in the form of online chats and social media posts. The Government also intends to offer statements made by the individuals with whom the defendant exchanged messages and to whom he disseminated video links, articles, and photographs. As described below, the defendant's statements are admissible when offered by the Government against him as admissions of a party opponent, *see* Fed. R. Evid. 801(d)(2)(A), and the statements of those he conversed with—including those of CHS-1 and OCE—are admissible for the limited and permissible purpose

of placing the defendant's statements in context and to show the effect of the words on the listener, the defendant, and are not being offered for the truth of the matter asserted.

### A. Applicable Law

#### 1. The Rule Against Hearsay

Hearsay is a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801(c)(2), and is admissible only if it falls within an enumerated exception, Fed. R. Evid. 802. But "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note. Thus, a statement offered to show its effect on the listener is not hearsay. *See United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice.").[9]

#### 2. Rule 801(d)(2)(A)

A statement "is not hearsay" if "[t]he statement is offered against an opposing party" and "was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). *See, e.g.*, *United States v. Alvarez-Porras*, 643 F.2d 54, 56-57 (2d Cir. 1981) ("A criminal defendant's out-of-court statements, ordinarily barred by the hearsay rule, are admissible against him as nonhearsay under" Rule 801(d)(2)(A)). Statements admitted under Rule 801(d)(2)(A) "need not be incriminating to fall within the exception to the hearsay rule." *United States v. Gotti*, 457 F. Supp. 2d 395, 401 (S.D.N.Y. 2006) (citing *People of Territory of Guam v. Ojeda*, 758 F.2d 403, 408 (9th Cir. 1985) ("Cases interpreting section 801(d)(2)(A) are in agreement that statements

---

[9] Unless otherwise specified, all case quotations omit internal quotation marks, citations, ellipses, and prior alterations.

need not be incriminating to be admissions. For statements to constitute admissions they need only relate to the offense.").

### 3. Context for Admissible Statements

Statements made by others conversing with the defendant can be admitted to provide necessary context for the defendant's statements. *See United States v. Estevez*, No. S2 16 CR 307 (CM), 2017 WL 700775, at *4 (S.D.N.Y. Feb. 16, 2017) (collecting cases). For example, emails sent to a defendant are not hearsay and are properly admitted "to provide context for defendants' messages sent in response to them, messages whose admissibility is not contested." *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006) (citing Fed. R. Evid. 801(d)(2)); *see also United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990) (upholding admission of statements of "informant who is heard in a tape-recorded conversation with the defendant[,] [s]o long as the informant's recorded statements are not presented for the truth of the matter asserted, but only to establish a context for the recorded statements of the accused . . . ."); *see also United States v. McNair*, 46 F. App'x 658, 659-60 (2d Cir. 2002) (summary order) (upholding admission of recordings between defendant and non-testifying informant where informant's statements "were not offered to prove the truth of the matters asserted but only to render what [the defendant] said in these conversations intelligible"); *United States v. Romano*, No. 12 Cr. 691 (JFK), 2014 WL 69794, at *1 (E.D.N.Y. Jan. 8, 2014) (same); *United States v. Walker*, No. 99 Cr. 379 (BSJ), 1999 WL 777885, at *4 (S.D.N.Y. Sept. 29, 1999) (same).

## B. Discussion

At trial, the Government intends to offer the statements of the defendant made in furtherance of his criminal conduct. In addition, the Government will seek to admit certain non-hearsay statements—that is, statements not offered for the truth of the matters asserted—to provide context for the defendant's statements.

The Government will offer the defendant's own statements in conversations with, among others, CHS-1 and the OCE, as well as the defendant's online posts in which he disseminated training materials for jihad and chemical weapon and bomb-making instructions. For example:

- The Napalm/White Phosphorus Chat, in which the defendant described in meticulous detail for CHS-1 how to manufacture an improvised chemical weapon and deploy it on a concert crowd, "lighting every kaffir on fire."

- The SOGRU Chat, in which the defendant described for the chat participants—who CHS-1 made clear to the defendant were fellow jihadists—the type of tactical gear he needed for their "op"; obtained their measurements for such gear; asked whether they knew how to use and "zero" "red dot optics" (a firearm sight that projects a red dot on an intended target); informed them that he would make sure they all had "ak47s"; discussed how to "disable all aerial assets"; and shared an "air defense manual" that he authored, among other things.

- The InGhimasi Channels, in which the defendant disseminated dozens of instructional videos and other training materials—including about how to make bombs and chemical weapons—to his subscribers so they could learn how to "operate as an untraceable asset of the Khalifa in Darul Harb."

- Numerous other chats with CHS-1 and the OCE in which the defendant, among other things, (1) requested supplies that he needed to carry out his operational plans (for example, magazine pouches, a plate carrier (*i.e.*, a type of body armor), and rifle accessories); (2) provided identifying details about himself (for example, providing his address, discussing his criminal history, and sharing information about his brother); (3) discussed ISIS; (4) conveyed his negative thoughts about the "west" and nonbelievers of Islam; and (5) described his desire to kill such nonbelievers, including potentially by way of a "DC Sniper scenario," a reference to a series of coordinated sniper attacks that terrorized the Washington, D.C. area in 2002.

Each of the defendant's statements is squarely admissible against the defendant as non-hearsay. *See, e.g.*, *Alvarez-Porras*, 643 F.2d at 56-57. Moreover, each of these types of statements by the defendant are admissible as direct evidence of one or more crimes with which the defendant

is charged. For example, the Napalm/White Phosphorus Chat, and the instructional videos about how to make white phosphorus and improvised explosives like TATP the defendant posted on the InGhimasi Channels, are themselves examples of the "material support or resources" the defendant attempted to provide to others, "knowing or intending that they are to be used in preparation for, or in carrying out," a weapons of mass destruction offense under 18 U.S.C. § 2332a, an offense related to the bombing of a place of public use under 18 U.S.C. § 2332f, and a chemical weapons violation under 18 U.S.C. § 229 (S1 Count One); as well as direct evidence of the defendant's assistance or inducement of another to—or attempt himself to—"develop, produce, . . . possess, or use, or threaten to use" a chemical weapon (S1 Count Two). And as discussed in additional detail further below, these statements of the defendant likewise bear directly on his mental state and his intent to commit the charged offenses.

The Government also intends to offer certain statements made by other individuals in conversations with the defendant solely for their effect on the listener—the defendant—irrespective of their truth. For example:

- In a chat between CHS-1 and the defendant (on an encrypted messaging application called "Conversations"), CHS-1 told the defendant that CHS-1 was located in Germany. CHS-1 subsequently sent a photo to the defendant of the ISIS flag and said, "I do not worry about the German government, I have other connections[.]" CHS-1 then told the defendant, "I was in Iraq with dawla [that is, ISIS] for a while[.]"

- Before CHS-1 created the SOGRU Chat, CHS-1 told the defendant that the other members of the chat would be "brothers who have trained with dawla."

- In the SOGRU Chat, while discussing with the defendant certain specifics about his planned "op," the other participants made representations to the defendant about their purported background, including their military and tactical experience.

- In a Telegram chat in which the defendant used the moniker "Battar Nabi," in discussing the procurement of rifle modifications, the defendant stated, "I dont [sic] if the other 3 brothera [sic] know how to use scopes and all that properly . . . ." CHS-1 replied, "There are brothers who have trained with dawla[.]"

Statements like these are likewise admissible for their effect on the defendant, as evidence of his knowledge and intent. In addition, these messages are admissible to provide essential context for the jury for the defendant's own statements and, thus, to make the defendant's portions of these chats intelligible. *See, e.g.*, *Dupre*, 462 F.3d at 137; *McNair*, 46 F. App'x at 659-60. The Government does not intend to offer any statements made by the CHSes or OCE in their conversations with the defendant for their truth.

## II. <u>Evidence of the Defendant's Albanian Criminal History and His Brother's Federal Conviction Are Admissible to Demonstrate that the Defendant Was the User of Certain Online Accounts</u>

The Government seeks to offer limited evidence of the defendant's Albanian criminal history and the federal convictions of the defendant's brother Sajmir Alimehmeti ("Sajmir") as direct evidence for the narrow purpose of establishing the defendant as the author of various encrypted chats sent from numerous online accounts across multiple platforms. The defense has indicated its intention to dispute the defendant's authorship of the communications described above—including communications in which the defendant provided his own name and Albanian mailing address—and thus, the Government will need to present such evidence to prove to the jury that the defendant is in fact the author of the communications.

### A. Relevant Facts

Throughout the charged conduct, the defendant communicated with CHS-1, the OCE, and others on multiple different online platforms, including Facebook, Telegram, and another encrypted messaging application named "Conversations." Within each platform, the defendant frequently switched his username or moniker. For example, just *some* of the numerous monikers

used by the defendant include: (1) the defendant's true legal name on Facebook; (2) "Jake Giles" on Facebook; (3) "Kaalab Maaqib" on Facebook; (4) Arabic characters that translate to the word "Despite" on Conversations; (5) "Battar Nabi" on Telegram; (6) "KPMC" on Telegram; (7) "CASEVAC ETA 10MIKS" on Telegram; (8) "InGhimasi Warfare" on Telegram; (9) "InGhimasi Tactical Solucion" on Telegram; (10) "TacEffective InGh1mas!" on Telegram; and (11) "InGhimas1 Tactical" on Telegram. Absent a stipulation from the defendant as to account attribution, the Government will have to prove at trial that the defendant was the user of each of these accounts during the relevant communications.

The defendant made statements across different accounts revealing personal identifying information—in the form of discussing his own and his brother's criminal histories—upon which the Government intends to rely to prove attribution. The chats below are illustrative examples of such statements by the defendant:

1. Example 1: On or about June 22, 2019, using the Facebook account in his true name, while discussing the need to use secure messaging applications, the defendant told CHS-1, "Im [sic] under watch by counter terrorism so i [sic] hope ur using TOR[10] on [F]B." CHS-1 asked, "How long have they been watching you[?]" The defendant responded, "Wa iyakum.[11] 5 months then arrested. Did 4 yrs in prison. 3rd week i [sic] am free[.] So 4yrs 8 months total[.] I got out of prison last month[.]"

2. Example 2: On or about June 24, 2019, using the "Despite" moniker on Conversations, the defendant told CHS-1, "Gota [sic] find a job and make money. I had money before the mushriks[12] arrested me[.]"

---

[10] Tor is open-source software that makes it more difficult to trace a user's internet activity by preventing others from being able to view where the internet traffic originated from and where the internet traffic is going.

[11] "Wa iyyakum" means "and the same to you" in Arabic, which appears to be the defendant's response to a prior message in which CHS-1 said to the defendant, "May Allah protect you[.]"

[12] "Mushrikeen" or "mushrikun" are transliterations of Arabic words meaning infidels.

3. Example 3: On or about June 27, 2019, using the "Despite" moniker on the Conversations application, the defendant sent CHS-1 a Google search for Sajmir, stating, "this is my little brother . . . . Its [sic] the link to search results when you type his name on google Sajmir Alimehmeti[.]" CHS-1 asked, "[I]s he still in prison?" The defendant replied, "3yrs without receiving a sentence[.] Probably going to get 30 from the dogs of the cross[.]"[13] CHS-1 asked, "Is he in prison waiting or home at least?" The defendant replied, "No federal prison new york[.]"

4. Example 4: On or about October 11, 2019, using the "Battar Nabi" moniker on Telegram, the defendant told CHS-1, "Thats [sic] what my brother wud [sic] do ans [sic] I would tell had m [sic] don't pray behind the kaffir now hes in prison cuz he made friends with spies there[.]"

5. Example 5: On or about October 17, 2019, using the "Battar Nabi" moniker on Telegram, the defendant told CHS-1, "My bro is a prisoner[.]"

6. Example 6: On or about October 19, 2019, using the "Battar Nabi" moniker on Telegram, the defendant told CHS-1, "And surespot[14] was safe then so gov dont [sic] know about this op or i would've been arrested way earlier than i [sic] was. The only proof they had was my bro mentioning me to undercover agents saying me n my bro have our own plan for hijra[.][15] Otherwise i [sic] would never have been under surveillance or prison."

7. Example 7: On or about January 17, 2020, using the "CASEVAC ETA 10MIKS" moniker on Telegram in the SOGRU Chat, the defendant said, "My English not as good as it used to be after 4 years prison here[.]" The following day in the same chat, the defendant said that martial arts "helped [him] a lot in prison[.]"

8. Example 8: On or about January 19, 2020, using the "CASEVAC ETA 10MIKS" moniker on Telegram in the SOGRU Chat, in response to one of the chat participants, "Allah SWT blessed me

---

[13] "Dogs of the cross" is a derogatory term used by ISIS and ISIS supporters to refer to Christians or westerners.

[14] Surespot was a free, open-source, end-to-end encrypted messaging application that shut down in 2022.

[15] "Hijra" is a transliteration of an Arabic word that translates directly to "emigration," but in the context of ISIS propaganda, refers to traveling to live under the rule of ISIS.

> with dense bones. I hit someone on the face once, chances are no need to continue the fight." The defendant replied, "Ma sha Allah akhi my little brother is like that[.]"

Apart from mere consistency in the defendant's statements about his own and his brother's criminal records across platforms and online accounts, the Government intends to prove that the defendant's statements are factually correct. As to the defendant's own time spent in prison, the Government anticipates introducing testimony or certified Albanian records confirming the length of the first prison term the defendant served in Albania. In 2015, the defendant was arrested and convicted in the Tirana Judicial District Court in Albania for illegal possession and production of weapons, explosive weapons and ammunition, and sentenced to four years and eight months; he was released in May 2019, the month before he began communicating with CHS-1.[16] The Government also anticipates introducing certified records of the judgment of conviction of the defendant's brother Sajmir, who pleaded guilty in the Southern District of New York to attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B; and passport fraud, to facilitate an act of international terrorism, in violation of 18 U.S.C. § 1542, in February 21, 2018. *See United States v. Sajmir Alimehmeti*, No. 16 Cr. 398 (PAE), Dkt. 114 (Feb. 21, 2018 S.D.N.Y.).[17] On December 6, 2019, Judge Engelmayer sentenced Sajmir to 22 years' imprisonment. *Id*. at Dkt. 133.

---

[16] Absent the defense opening the door, the Government has no objection to redacting the precise counts of conviction or to otherwise refraining from eliciting the counts of conviction should a witness testify in lieu of a certified record. The salient point of this testimony or these records for the purposes of account attribution is the length of the defendant's prison sentence and his release date.

[17] Like with the defendant's Albanian convictions, the Government has no objection to redacting the precise counts of Sajmir's conviction. That Sajmir was prosecuted in federal court and was in prison at the times that the defendant referenced having a brother in prison are the relevant aspects of his conviction that the Government requires to prove account attribution.

### B. Applicable Law

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). "Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Coonan*, 938 F.2d at 1561 (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821 (1988)). This includes evidence of conduct from before the period of the charged crime. *See, e.g.*, *United States v. Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012).

Under Rule 404(b), evidence of a defendant's prior crimes, wrongs, or acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit follows an "inclusionary approach" under which "prior act evidence is admissible if offered for any purpose other than to show a defendant's criminal propensity." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017).

Whether evidence is admitted as direct evidence or under Rule 404(b), the probative value must not be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The touchstone of this analysis is whether the proffered evidence of uncharged acts does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). "[A]ny proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995).

### C. Discussion

The Government should be permitted to introduce statements made by the defendant on various encrypted messaging accounts regarding his own criminal history and his brother Sajmir's criminal convictions, as well as evidence establishing the accuracy of those statements, for the limited purpose of proving the defendant's identity as the user of those accounts.

*First*, the defendant's own criminal history is admissible as direct evidence—and in the alternative, as 404(b) evidence—of the defendant's identity. As described above, the defendant constantly switched online accounts and monikers to obfuscate that he was the user of those accounts, and (absent a stipulation between the parties) it is the Government's burden to prove that the user of those various accounts at all relevant times was in fact the defendant. The defendant's repeated mentions of his own criminal history are critical to showing that the same person used many of the accounts in question and are a common thread across many of the accounts the Government alleges were operated by the defendant. The defendant first mentioned his own arrest, the 4 years and 8 months he spent in prison, and his release date in a chat he sent from a Facebook account in his true name. (*See* Example 1). Thus, subsequent references to the account user having served time in prison, sent from *different* accounts whose monikers are entirely unrelated to the defendant's true name, are relevant to attributing those accounts to this defendant. For instance, days after the message in Example 1, using a different online account (moniker "Despite" on the application Conversations), the defendant again referenced his prior arrest. (*See* Example 2). And months later, using yet a different online account (moniker "CASEVAC ETA 10MIKS" on Telegram), the defendant talked again about the four years he spent in prison. (*See* Example 7).

*Second*, Sajmir's criminal history is relevant for precisely the same reason: it demonstrates that the user of the various online accounts is in fact the defendant. In the same chat thread from the "Despite" account, the defendant shared the name of his "little brother" "Sajmir Alimehmeti,"

said that Sajmir was in federal prison, and speculated that Sajmir would be sentenced to a 30-year term of imprisonment. (*See* Example 3). Then, from an entirely new account also unaffiliated with the defendant's true name (moniker "Battar Nabi" on Telegram), the defendant referred back to his brother being in prison, (*see* Examples 4 and 5), and his brother having been caught speaking to undercover agents, (*see* Example 6). Importantly, the fact of Sajmir's status as a prisoner is critical for attribution for the "Battar Nabi" account, because unlike the first time the defendant mentioned Sajmir to CHS-1 using the "Despite" account, the defendant did not use Sajmir's name in the "Battar Nabi" account messages. He merely referenced his brother being in prison, and the jury is entitled to infer that this reference is to Sajmir, and thus, that the operator of the "Battar Nabi" account is the defendant. Later, using yet another account unaffiliated with his true name (moniker "CASEVAC ETA 10MIKS" on Telegram), the defendant mentioned his "little brother," the same way he referred to Sajmir using the "Despite" account.

*Third*, the factual accuracy of the defendant's statements about his and Sajmir's criminal history is highly probative of the fact that the user of the accounts in question was in fact the defendant. The account user consistently and correctly described the time period the defendant spent in prison, and the fact of Sajmir's convictions in federal court. In a case in which the defendant intentionally and frequently switched online accounts to evade law enforcement detection, and in which the attribution of those accounts is essential at trial and the defense intends to dispute those attributions, underlying proof of the defendant's prison term and Sajmir's federal conviction is compelling and important evidence that the defendant was on the other side of the computer or phone screen. Without any extrinsic evidence, the consistency of descriptions of the defendant's and Sajmir's criminal histories across different accounts permits the jury to conclude that the user of these different accounts is the same person. But the fact that the descriptions of the

defendant's and Sajmir's criminal histories are *accurate* permits the jury to conclude that the user of these different accounts is the defendant himself, because the defendant would have known—and did know—the true and correct facts surrounding the length of his own prison term, his release date from prison, the status of his brother's federal case, and the length of sentencing exposure his brother had.

Furthermore, the Government must be permitted to prove authorship of the electronic communications that provide the bulk of the evidence in this case, including by identifying details in the communications and corroborating evidence linking those details to the purported author. *See, e.g.*, Fed. R. Evid. 901(b)(4) (permissible evidence for authentication includes the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances"); *United States v. Browne*, 834 F.3d 403, 411 (3d Cir. 2016) (upholding the authentication of pseudonymous Facebook conversations attributed to defendant because authorship was adequately established through a broad range of extrinsic evidence, including testimony from individuals who communicated with the defendant and evidence corroborating the communications' contents); *United States v. Simpson*, 152 F.3d 1243, 1250 (10th Cir. 1998) (chat messages were sufficiently authenticated based in part on document found in the defendant's home containing identifying details that the detective had given to the defendant in the chat). Here, because the defendant detailed his own criminal history and that of his brother Sajmir in his chats, evidence about that criminal history is relevant extrinsic evidence and should be admitted to allow the Government to satisfy its burden of proving the defendant's identity as the sender of the relevant messages.

*Finally*, the acute probative value of this evidence is not "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The Government does not seek to offer the most

damning details of these criminal histories: the crimes of conviction. Rather, the Government seeks to offer, for the narrow purpose of proving identity, the sanitized facts of the length of the defendant's prison term, his release date from prison, the fact that his brother Sajmir was prosecuted in federal court, and the length of his brother's sentence. To the extent that there is any risk of unfair prejudice from otherwise probative evidence, however, the Court could provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged, and—absent the defendant opening the door to any additional potential uses of this evidence—that the jury is permitted to consider the criminal history solely for the limited purpose of determining whether the defendant was the user of the accounts in question. *See, e.g.*, *United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice).

## III. Evidence of the Defendant's Belief That He Was Under Law Enforcement Surveillance Is Admissible

Throughout his online chats, the defendant expressed in various ways his belief that he was being watched or otherwise investigated by law enforcement. The defendant's statements to this effect are admissible as direct evidence of the defendant's state of mind and to explain why the defendant used so many online accounts and made certain self-serving statements throughout his written communications.

As described *supra*, in the context of discussing his own and his brother's criminal histories, on or about June 22, 2019, using the Facebook account in his true name, the defendant told CHS-1, "Im [sic] under watch by counter terrorism so i [sic] hope ur using TOR on [F]B." (Example 1). Later that same week, on or about June 27, 2019, using a different account (moniker "Despite" on the Conversations application), the defendant told CHS-1, "Counter terrorism took my mother to the police station 2 days before my release and asked her what am i [sic] going to

do when i [sic] am out and told her that i [sic] am very violent and to keep me close. Meaning watch me."[18] ("Example 9"). And in chats sent from a third account (moniker "Battar Nabi" on Telegram), the defendant described his belief that he was previously arrested because his "bro mention[ed] me to undercover agents saying me n my bro have our own plan for hijra [*i.e.*, a plan to travel to live under ISIS rule]." (Example 6). In that same message exchange, the defendant expressed his opinion that without his brother mentioning him to law enforcement, "i [sic] would never have been under surveillance or prison." (Example 6). This context of the defendant's state of mind—his subjective belief and concern that he was being "watched" or "surveill[ed]" by law enforcement—is important for the jury to understand two, distinct decisions on the part of the defendant: (1) to use and frequently switch between using numerous different online accounts, and (2) to disclaim his own inculpatory statements about gathering tactical equipment and planning attacks, close in time to when he made the incriminating statements in question. In short, this evidence sheds light on "the understanding or intent with which certain acts were performed." *Coonan*, 938 F.2d at 1561.

As to the online accounts, the defendant's understanding that he was being surveilled by the police provides background and context to the jury to explain why the defendant would have operated so many different accounts across multiple online platforms, and why the defendant did not use his true name in connection with the vast majority of those online accounts: he was trying to avoid law enforcement detection, which he believed to be a real threat, because he believed he was actively being watched by the police, knew that his brother had previously been targeted through similar law enforcement tactics, and feared potential arrest or prosecution for his crimes.

[18] The Government is not seeking to use the subsequent messages sent by the defendant in this chat, which include, in reference to his mother, "Shes [sic] an enemy of Allah as well. She curses God. Counter terrorism has more respect for religions and God tham [sic] she does."

This is relevant both to the defendant's consciousness of guilt, and to attributing the accounts to the defendant more generally. It is an especially important point where the defendant has indicated that he plans to dispute that he was the user of the accounts, and insight into the defendant's concerns that he was being watched by the police help to rebut any potential defense argument that the number of accounts or monikers for those accounts somehow suggests that the defendant did not operate them.

Moreover, the defendant's subjective belief that he was under investigation explains why the defendant took care in his written communications to sometimes disclaim the very ideas and plans he had just espoused. For example, when using the "Despite" moniker on the Conversations application and messaging CHS-1 about ISIS and procuring tactical gear, the defendant spontaneously stated, "If ur [sic] an agent it doesnt [sic] matter . . . because like i [sic] said none of this is illegal[.]"[19] The defendant's other statements—including those in which he blamed his arrival on the police's radar on Sajmir's telling "undercover agents" about the defendant's and Sajmir's plans for "hijra," (Example 6)—explain why the defendant felt the need to offer up his purported views on the legality of his actions: in the event his messages were being read by law enforcement, he wanted a cover story.

[19] The defendant made other statements to CHS-1 about his purported belief that he was not doing anything illegal. For example, in this same chat using the "Despite" moniker, before asking CHS-1 to procure a "plate carrier" (bulletproof vest) and firearms accessories including handguards, buttstocks, and optics, for him, the defendant said, "Can you help me with something?its [sic] nothing illegal but its [sic] something im [sic] not able to do in Albania." To the extent the defendant seeks to admit this or similar statements in this or other chat threads to show the defendant's state of mind, the defendant's own statements about his belief that he was under law enforcement suspicion are even more probative to combat any defense suggestion that the defendant really did not think he was violating the law, when the defendant's own messages make clear that in reality, he knew he was breaking the law and simply did not want to get caught doing so.

The defendant hedged in the exact same way, for example, in the Napalm/White Phosphorus Chat. Immediately before the defendant gave CHS-1 detailed instructions about how to manufacture an improvised chemical weapon and spray it on a crowd at a concert setting everyone on fire, the defendant hedged, "Let me tell you a good plan, its [sic] not achievable in my opinion but it's a good plan[.]" Immediately after providing his instructions, the defendant added that his plan "needs money and too much time to prepare[, a]nd many safety precautions."[20] To the extent the defense seeks to offer these disclaimers or others like them as evidence that the defendant was merely posturing and did not intend for anyone to follow his instructions about how to manufacture and deploy a chemical weapon, the Government is entitled to rebut that assertion with the defendant's own statements that he believed law enforcement was watching him. Such state of mind evidence bears directly on the defendant's consciousness of guilt and *mens rea* as to each of the charged offenses. The jury is permitted to infer that the defendant meant what he said and intended for others to act on his instructions, advice, and training materials, and that his strategically deployed disclaimers were just that: a self-serving attempt to avoid prosecution and give himself plausible deniability.

## IV. <u>**Evidence of Terrorist Propaganda Materials Possessed or Disseminated by The Defendant Is Admissible**</u>

The Government seeks to offer at trial evidence of certain conduct and communications of the defendant as direct evidence of the charged crimes and, in the alternative, as evidence of other acts under Rule 404(b). Specifically, the Government intends to offer online chats, videos, images, and documents that show defendant used multiple social media accounts and encrypted messaging accounts to post and disseminate Terrorist Propaganda Materials promoting and glorifying jihadist

[20] The defendant also stated, "Napalm way is easier and safer but less deadly[.]"

and terrorist ideology, and Terrorist Propaganda Materials recovered from three electronic devices seized from the defendant.[21]

As explained below, the Terrorist Propaganda Materials are highly relevant, as they tend to show, among other things, that the defendant embraced a terrorist ideology, supporting ISIS in particular, and intended to assist others in harming nonbelievers in furtherance of his views. The significant probative value of such materials outweighs any potential prejudicial effect, particularly given that the Government will omit certain especially graphic portions from the videos that it offers, as discussed below. Accordingly, the Government respectfully seeks a pretrial ruling that the Terrorist Propaganda Materials are admissible.

### A. Relevant Facts

The Terrorist Propaganda Materials that the defendant posted and shared online reflect the defendant's immersion in terrorist ideology, and allegiance to ISIS in particular. Specifically:

- On June 28, 2019, the defendant declared to CHS-1 his loyalty to "sharia rules," stated he would behead his family if they opposed this religion, and sent a photograph depicting ISIS leader Abdul Rahman al-Iraqi posing in front of a row of severed heads. The defendant captioned this picture with "Thats what I think of the sahawat."[22]

[21] The Government submits that the Terrorist Propaganda Materials described in this brief are admissible as direct evidence of the charged crimes. To the extent the Court determines that any such evidence constitutes evidence of other acts, the Government hereby provides notice under Rule 404(b)(3) of its intent to offer the evidence in the alternative to establish the defendant's motive, intent, knowledge, and identity, and not to demonstrate criminal propensity. The evidence is probative of these permissible purposes for the reasons set forth *infra*. The Government will supplement this notice as appropriate. The Government likewise provides Rule 404(b) notice for evidence of the defendant's and Sajmir's criminal histories, as described *infra* Argument Section II, and evidence of the equipment purchased by Individual-1 at the defendant's direction, as described *infra* Section VI.

[22] "Sahawat" is a derogatory term used by ISIS to refer to the Free Syrian Army.

- On or about June 30, 2019, the defendant posted a photograph of then-ISIS propagandist Shaykh ul-Haqq Musa Cerantonio[23] and the following status update: "Shaykh ul-Haqq Musa Cerantonio, may Allah bless him and protect him. The Shaykh who raised the soldiers of the Caliphate you now see in the Philippines today. Outlawed by kuffar . . . and all other dollar preacher infidels he made hijra to the Philippines where he called the Muslims to the truth."

- On or about July 2, 2019, the defendant posted a photograph of the Libyan terrorist and high-ranking al Qaeda official Abu Yahya al-Libi with the following status update: "Abu Yahya al-Libi . رحم الله The brother is a mentor to me and one of the first people I learned the aqeedah from. Allah enable us to meet in Jannah."

- On or about July 13, 2019, the defendant posted: "The few. The steadfast. The inghimasiyeen." The term "inghimasi" refers to militants employed by ISIS and other extremist groups to conduct suicide attacks.

- In or about June and July 2019, the defendant also posted photographs of various jihadist publications, such as a book entitled "The Islamic Ruling of the Permissibility of Self-Sacrificial Operations: Suicide, or Martyrdom?," "The Book of Jihad," "Mines and Boobytraps," "Operators Manual for AK47," "The Anarchist Cookbook," and "Ad-Dala'il FI Hukm Muwalat Ahl Al-Ishrak" (translated on the publication as "The Evidence for the Ruling Regarding Alliance with the Infidels and Matters Related to It").

- On or about January 22, 2020, the defendant posted two videos on Facebook with text that read "Biological warfare is halal. Employ it." and "Khalifah must employ Biological Warfare. Revenge for Baghuz." "Khalifah" is a reference to ISIS's leadership, and "Revenge for Baghuz" is an apparent reference to a spate of attacks by ISIS around the world in April 2019 as revenge for the Battle of Baghuz Fawqani.

Some of the Terrorist Propaganda Materials also evidence the defendant's intent to harm nonbelievers in accordance with ISIS instructions. Specifically:

---

[23] Cerantonio is a former Australian Islamic extremist who encouraged numerous foreign fighters to join jihadist groups in Syria and served four years in Australian prison for a plot to establish Sharia law in the Philippines.

- On the InGhimasi Warfare Channels, the defendant shared dozens of links to "training" resources and text statements that indicate the training was intended in support of ISIS. On November 4, 2019, the defendant posted: "Here you will learn basic skills you will need to operate as a soldier! Shirk is your enemy, the kuffar [nonbelievers] are your targets and Jannah [paradise] is your destination!" On November 6, 2019, the defendant posted an infamous video titled, "You Must Fight Them O Muwahhid," produced by ISIS to show viewers how to make TATP explosives at home. The accompanying description provided by the defendant clearly encouraged consumers to use the training in this video on behalf of ISIS (Khilafa): "a video release from the official media of the Khilafa, explaining how YOU O Muwahid can make TATP explosives in your own home . . . SO FIGHT THEM O MUWAHID." And on November 19, 2019, the defendant posted, "Ways to operate as an untraceable asset of the Khilafa in Darul Harb," that is, an asset of the ISIS "caliphate" in enemy territory.

- Additional videos posted to the channel included a "TATP synthesis" video and a video titled "Explosive for Blasting in Mines."

- In chats with CHS-1 and the OCE, the defendant derided "kuffars" and called for their killing. For example, as detailed above, in the Napalm/White Phosphorus Chat, the defendant described, in detail, how to produce white phosphorus and a sticky napalm-like substance that could be loaded into a tanker and used to spray crowds.

Law enforcement recovered additional Terrorist Propaganda Materials similar to the materials recovered from the defendant's online accounts, as well as file fragments corresponding to well-known ISIS media, from three of the defendant's electronic devices: a laptop seized by Albanian authorities from the defendant in 2020 ("Alimehmeti Laptop-1"), and a laptop ("Alimehmeti Laptop-2") and USB drive (the "USB") seized from the defendant in 2024 shortly on the day of his arrest in the United States. Specifically:

- Videos from the known ISIS propaganda series titled, "Inside the Khilafa," showing ISIS fighters in Syria and elsewhere conducting attacks, dragging bodies in the streets, and displaying ISIS flags, and instructing the viewer to "commit jihad where you are" and open online accounts in support of ISIS.

- File fragments or book covers for publications such as "The Islamic Ruling on the Permissibility of Martyrdom Operations," "The Golden Book of Chemistry Experiments," "The Book of Jihad," and "Anarchist Bomb Cookbook."

**B. Applicable Law**

**1. Relevance and Materiality Under Rules 401 and 402**

Federal Rules of Evidence 401 and 402 establish the broad principle that relevant evidence is admissible at trial except as otherwise provided by the Constitution, federal statute, or Rules of Evidence. See Fed. R. Evid. 401, 402; *United States v. Abel*, 469 U.S. 45, 51 (1984). Rule 403 allows a trial judge to exclude relevant evidence if, among other things, "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

"To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010). Rather, evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401; *see United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."). Thus, evidence is often admissible "to provide background for the events alleged in the indictment" or "to enable the jury to understand the complete story of the crimes charged." *United States v. Reifler*, 446 F.3d 65, 91-92 (2d Cir. 2006). "Background evidence may be admitted to show, for example, the circumstances surrounding the events, or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan*, 938 F. 2d 1553, 1561 (2d Cir. 1991). As the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering

party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997).

**2. Other-Acts Evidence Under Rule 404(b)**

Rule 404(b) of the Federal Rules of Evidence prohibits admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). The same rule, however, also allows the introduction of such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* The Second Circuit follows the "inclusionary" approach to other-acts evidence, "under which such evidence is admissible unless it is introduced for the *sole* purpose of showing the defendant's bad character, or unless it is overly prejudicial . . . or not relevant." *United States v. Carlton*, 534 F.3d 97, 101 (2d Cir. 2008) (emphasis added).

Thus, to the extent evidence of prior or subsequent acts is not direct evidence of the charged crimes, it remains admissible under Rule 404(b) if it is: (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)); *United States v. Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("other acts or crimes are admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity"). For example, Rule 404(b) evidence may be "necessary to explain the relationships among the parties and witnesses, and the context of events." *United States v. Lee*, No. 02 CR. 602 (AKH), 2003 WL 1746968, at *2 (S.D.N.Y. Apr. 1, 2003). Such evidence is admissible "to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed."

*United States v. Williams*, 205 F.3d at 33-34 (citing *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992)).[24] Moreover, "evidence of defendant's [other crimes can be] properly admitted to show identity through a common *modus operandi*." *Carlton*, 534 F.3d at 101–02 (quoting Fed. R. Evid. 404(b)(2)); *see also United States v. Sliker,* 751 F.2d 477, 487 (2d Cir.1984). Evidence of the defendant's participation in other acts can also be "highly probative of [the defendant's] state of mind in committing the charged offense." *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011) (affirming admission of 404(b) evidence that the defendant associated with terrorist groups other than al Qaeda, to which he had allegedly provided material support).

### 3. Probative Value Under Rule 403

Whether evidence is admitted as direct evidence or under Rule 404(b), the probative value of such evidence must not be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The touchstone of the prejudice analysis under Rule 403 is whether the proffered evidence of uncharged acts does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged." *Roldan-Zapata*, 916 F.2d at 804. Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *Gelzer*, 50 F.3d at 1139. To the extent that there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the

---

[24] *See also United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007) (affirming admission of other-acts evidence to show how "illegal relationship" between co-conspirators evolved); *United States v. Pipola*, 83 F.3d 556, 565-66 (2d Cir. 1996) (noting that "legitimate purpose[s] for presenting evidence of extrinsic acts" under Rule 404(b) include "explain[ing] how a criminal relationship developed" and "help[ing] the jury understand the basis for the co-conspirators relationship of mutual trust").

crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").

### C. Discussion

#### 1. Direct Evidence

The Terrorist Propaganda Materials recovered from the defendant's electronic devices and disseminated by the defendant through his online accounts are admissible as direct proof of the charged offenses.

*First*, the Terrorist Propaganda Materials constitute direct evidence of the defendant's identity as the user of the various accounts and devices on which the materials appear, his motivation and intent to provide support to ISIS under Section 2339B, and his motivation and intent for providing material support for the preparation or commission of various predicate offenses under Section 2339A and for assisting and inducing the use of chemical weapons under Section 229. Based on the defendant's communications with CHS-1 and OCE, among other evidence, the defendant viewed himself as part of the global jihadist movement and was inspired by the Terrorist Propaganda Materials that he possessed on his electronic devices and shared online. The defendant's possession and dissemination of those materials during the charged offenses explain his efforts to support ISIS and that the defendant subscribed to, and was motivated by, a jihadist and terrorist ideology.

Evidence of the defendant's possessing and viewing the Terrorist Propaganda Materials is also direct evidence of the charged offenses because it is inextricably intertwined with other evidence, such as disseminating bomb-making materials and chemical weapons instructions to CHS-1, the OCE, and Matthews. Those chats show that the defendant provided CHS-1 and the OCE descriptions of his terrorist ideology, and thus the Terrorist Propaganda Materials complete

the story of the defendant's conduct and intent. *See United States v. Abu Ghayth*, 709 F. App'x 718, 723-24 (2d Cir. 2017) ("Far from 'pure speech,' Abu Ghayth's words provided material support to Al Qaeda by spreading its message to the world and encouraging others to join its terrorist cause."). The defendant's possession and dissemination of the Terrorist Propaganda Materials glorifying martyrdom in the name of jihad, celebrating ISIS's military campaigns and killing of civilians, and spewing anti-U.S. sentiment, thereby convey the motive and intent with which he undertook each of the charged offenses, which involved disseminating bomb-making or chemical weapons instructions. This is because the materials detail the defendant's purported worldview and antipathy toward nonbelievers, but also because the materials themselves depict some of the results he hoped to achieve through his and others' actions, such as the killing of non-Muslims and the recruitment and training of other, like-minded ideologues in service of acts of violence. *See Abu-Jihaad*, 630 F.3d at 133–34 (2d Cir. 2010) (affirming district court's finding that the "projihadist contents of the [terrorist propaganda] videos were relevant to understanding [the defendant's] motive and intent"); *United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013) (holding that videos, images, and literature that defendant had "absorbed and endorsed" were admissible to establish that defendant was "inspired by terrorist rants" and "developed an anti-American animus" that culminated in his decision to travel to Yemen to join al-Qaeda); *United States v. ElMezain*, 664 F.3d 467, 509-10 (5th Cir. 2011) (holding that material seized from defendant, "including images of violence and videos glorifying Hamas and depicting Hamas leaders, was probative of the motive or intent of the [defendant] to support Hamas"); *United States v. Jayyousi*, 657 F.3d 1085, 1108 (11th Cir. 2011) (holding that televised interview with bin Laden was properly admitted as "state of mind evidence").

In addition, the Terrorist Propaganda Materials, much of which the defendant posts on the very accounts with which he communicated with CHS-1 and the OCE, are "necessary to explain the relationships among the parties and witnesses, and the context of events." *United States v. Lee*, No. 02 CR. 602 (AKH), 2003 WL 1746968, at *2 (S.D.N.Y. Apr. 1, 2003). Here, CHS-1 and the OCE each formed a relationship with the defendant based on their purported mutual ideologies and goals, and it is in the context of these relationships that the defendant committed the charged crimes. This evidence is needed to help explain to the jury how the relationship between the participants in the crime developed, *see Williams*, 205 F.3d at 33-34, and the significance of the defendant's provision of dangerous materials to these individuals whom he believed to share his terrorist aims.

*Second*, the Terrorist Propaganda Materials posted to the defendant's online accounts, shared in his chats, and stored on his electronic devices are highly probative of his knowledge that ISIS was a designated FTO or has engaged in "terrorist activity" or "terrorism," which is an element of the charged material-support offense under Section 2339B. *See* 18 U.S.C. § 2339B(a)(1); *United States v. Al Kassar*, 660 F.3d 108, 129 (2d Cir. 2011) (observing that § 2339B requires proof that defendant knows that "the organization he is aiding is a terrorist organization or engages in acts of terrorism"); *see* 8 U.S.C. § 1182(a)(3)(B) (defining "terrorist activity" for purposes of § 2339B to include any unlawful activity involving the use of any "explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property," or "[a] threat, attempt, or conspiracy to do any of the foregoing"); 22 U.S.C. § 2656f(d)(2) (defining "terrorism" for purposes of § 2339B to include "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents").

Here, the defendant stored and shared material depicting, among other things, ISIS's murdering of civilians, military combat operations, promotion of lone-wolf attacks, and threats against the West. Such materials thus constitute direct evidence of the defendant's knowledge that ISIS is a terrorist group that engages in terrorism and terrorist activity. *See, e.g.*, *United States v. Pugh*, 162 F. Supp. 3d 97, 114 (E.D.N.Y. 2016) (agreeing, as conceded by defendant charged with providing material support to ISIS, that "the fact that [the defendant] possessed certain ISIS or Jihadist propaganda on his computer or social media is potentially relevant to the charged offenses," and noting that "[t]he Second Circuit has regularly allowed terrorist propaganda to be admitted, particularly in the context of material support offenses, in order to prove the mens rea element of the offense" (citing *United States v. Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014); *Abu-Jihaad*, 630 F.3d at 133-34)); *see also id.* at 116 (finding that ISIS propaganda material offered by the Government "speaks directly to state of mind because it was found in [the defendant's] possession").

**2. Rule 404(b) Evidence**

In the alternative, the Terrorist Propaganda Materials are other-act evidence admissible pursuant to Federal Rule of Evidence 404(b).

*First*, some of the Terrorist Propaganda Materials appear in multiple places and therefore help establish the defendant's identity across accounts and devices. Most notably, the defendant posted videos and commentary to the Jake Giles Facebook account, with which he communicated with the OCE, and two of those very posts were recovered from a laptop seized by Albania and turned over to the FBI. Both sets of evidence are probative of identity because they tend to establish that the same individual created or controlled the materials found in both locations.

*Second*, the Terrorist Propaganda Materials establish the defendant's motive and intent in committing each of the charged crimes, all of which involved disseminating materials that could

be used to harm others. Put differently, even if the defendant's possession and sharing of these materials were not considered direct evidence of these crimes, they convey the state of mind with which the defendant committed the acts of dissemination that constitute the core conduct underlying both the material-support charges and the chemical-weapons charge. *See Mustafa*, 406 F. App'x at 528. Put differently, the Terrorist Propaganda Materials are evidence of the terrorist ideology that formed the common backbone of the charged offenses. Indeed, though charged as separate crimes, the defendant's activities—providing material support to ISIS, providing material support for the preparation and commission of various specific terrorist activities, and assisting and inducing the production and use of chemical weapons—were all outgrowths of a common motive to visit harm upon those the defendant deemed enemies and nonbelievers. *See United States v. Siddiqui*, 699 F.3d 690, 703 (2d Cir. 2012), *as amended* (Nov. 15, 2012) (affirming admission of documents discussing explosives and chemical weapons as probative of the defendant's anti-American motive for the charged attack).

**3. Rule 403**

The admission of the Terrorist Propaganda Materials does not run afoul of Rule 403. The probative value of this evidence is not outweighed, much less "substantially outweighed," by any risk of unfair prejudice. The defendant supported, wanted to join, and helped others to join a brutally violent terrorist organization, and carried with him videos and other materials glorifying and promoting the group's violent agenda, and thus this evidence is highly probative of the defendant's knowledge and intent as to the Section 2339B count. *See Mehanna*, 735 F.3d at 59-64 (finding terrorist propaganda admissible in material-support trial because it was highly probative to state of mind and "central to the government's narrative"); *United States v. El-Mezain*, 664 F.3d 467, 508-511 (5th Cir. 2011) (admitting terrorist propaganda evidence in material-support case over defendant's Rule 403 challenge, and stating: "Because this [is] a case about supporting

terrorists, it is inescapable . . . that there [will] be some evidence about violence and terrorist activity. It cannot be denied that [such] evidence [will be] unfavorable to the defendant[], but [the court] cannot conclude that it [will be] unduly prejudicial."). In addition, this evidence is highly probative of the defendant's motive as to the remaining two counts, as it supplies the reasons for the defendant's provision of the bomb-making and chemical weapons instructions.

Any argument that the potential prejudicial effect of such evidence substantially outweighs its probative value is also meritless as to the Section 2339A and Section 229 counts, as it is highly probative of the defendant's motives for providing material support for the charged predicate offenses and assisting and inducing the use of chemical weapons. Indeed, courts confronting similar Rule 403 issues have found that jihadist propaganda videos and documents found in a defendant's possession are admissible to show intent not only in material-support cases, but also in cases in which the defendant's terrorist sympathies provided context for the defendant's conduct in unlawfully disclosing national defense information and planning acts of violence. *See, e.g.*, *Abu-Jihaad*, 630 F.3d at 132-34 (affirming district court's admission of excerpts of jihadist propaganda videos including graphic combat scenes in case involving disclosure of national defense information); *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) (per curiam) (affirming district court's admission, over defendant's Rule 403 challenge, of "terrorism propaganda documents, possessed by the defendants, which bristled with strong anti-American sentiment and advocated violence against targets in the United States," reasoning that the materials evidenced the defendant's motive for bombing and also "provided the jury with background and an explanation of the understanding or intent with which certain acts were performed" (internal quotation marks omitted)).

While certain of the videos among the Terrorist Propaganda Materials possessed by the defendant do depict more graphic violence, such as the brutal executions of captives, the Government will not, in an abundance of caution, play footage showing such executions at trial (as discussed above), in order to avoid any risk of unfair prejudice. *See, e.g.*, *Pugh*, 162 F. Supp. 3d at 117-18 (admitting ISIS propaganda videos located on defendant's laptop showing mass executions and the rounding up and beheading of prisoners, provided that the Government edited the clips that it showed at trial to leave out the executions and beheadings, reasoning that while the proffered clips "show[] executioners, wielding knives, in the moments before an unseen execution," which is naturally "viscerally disturbing," such evidence "speaks strongly to [the defendant's] state of mind" and was not "unduly prejudicial"). Because it is impossible to grasp the full force of such propaganda videos without some sense of the exceptionally brutal violence that the videos seek to glorify, the Government anticipates briefly summarizing certain of the violence that has been omitted from the excerpts played at trial through the testimony of law enforcement and expert witnesses.

Finally, the Government notes that, to the extent the Court has any concern about the risk of unfair prejudice in connection with the admission of the Terrorist Propaganda Materials, any such concern can be addressed through a limiting instruction to the jury, directing the jury that the materials should only be considered regarding the defendant's knowledge, intent and motive in committing the charged crimes. *See United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009) (upholding Rule 403 determination where challenged evidence was "not especially worse or shocking than the transactions charged" and district court "gave several careful instructions to the jury regarding what inferences it could draw from the admitted evidence"); *Abu-Jihaad*, 630 F.3d at 134 (proper limiting instruction minimizes risk of undue prejudice from admission of relevant

terrorist propaganda materials); *see, e.g., Pugh*, 162 F. Supp. 3d at 118 ("[T]o the extent the risk of unfair prejudice arises at trial, the court will issue an appropriate limiting instruction at the appropriate time and at the request of the Defendant.").

## V. <u>The Court Should Take Judicial Notice of ISIS as an FTO</u>

The Government respectfully requests that the Court take judicial notice at trial of the designation of ISIS as an FTO, effective October 15, 2004. ISIS's designation as an FTO is an element of Original Count One. *See* 18 U.S.C. §§ 2339B(a)(1), 2339(a).

The Federal Rules of Evidence allow a court to take judicial notice of adjudicative facts—such as whether ISIS is, in fact, a designated FTO—when those facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1). Further, federal courts are required to judicially notice items published in the Federal Register. *See* 44 U.S.C. § 1507 (providing that "[t]he contents of the Federal Register shall be judicially noticed"); *United States v. Wood,* 335 F.3d 993, 1001 (9th Cir. 2003) (holding that the district court complied with federal law by judicially noticing a rule published in the Federal Register).

As to ISIS, the relevant portions of the Federal Register include the following:

- On October 15, 2004, the U.S. Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. *See* 69 Fed. Reg. 61292 (October 15, 2014).

- On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. *See* 79 Fed. Reg. 27972 (May 15, 2014). The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria, ad-Dawla al Islamiyya fi al-'Iraq wa'sh'Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. *Id.*

- On September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. *See* 80 Fed. Reg. 58804 (September 30, 2014).

To date, ISIS remains a designated FTO. *See* U.S. Dep't of State, Foreign Terrorist Organizations, http://www.state.gov/j/ct/rls/other/des/123085.htm (last visited November 10, 2026). Based on the foregoing, and pursuant to 44 U.S.C. § 1507 and Federal Rule of Evidence 201, the Government respectfully requests that the Court take judicial notice of the fact that the Islamic State of Iraq and al-Sham—including its aliases the Islamic State of Iraq and the Levant, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, Al-Furqan Establishment for Media Production, Islamic State, ISIL, and ISIS—is designated as an FTO, as determined by the U.S. Secretary of State and published in the Federal Register. Courts in this District have granted substantially identical motions from the Government. *See, e.g.*, *United States v. Saipov*, No. 17 Cr. 722 (VSB), Dkt. 811 at 15 (June 27, 2023 S.D.N.Y.); *United States v. El Gammal*, No. 15 Cr. 588 (ER), Dkt. 139 (Jan. 3, 2017); *see also Sajmir Alimehmeti* at 30-31 (granting Government's motion and stating that the Court would so-order the Government's proposed order absent a stipulation).[25]

## VI. Evidence of Tactical Equipment the Defendant's Friend Purchased at the Defendant's Direction Is Admissible

The Government expects to offer evidence about the equipment that the defendant's friend, Individual-1, purchased and stored for the defendant, including the testimony of Individual-1, an equipment list that the defendant sent to Individual-1, and the equipment itself. Evidence of the equipment is relevant as direct evidence of the charged terrorism offenses because the defendant

[25] Similarly, in *Ullah*, the Government moved *in limine* for the Court to take judicial notice of ISIS's designation as an FTO. *See Ullah*, Dkt. 35, at 18-20. The defendant did not oppose the Government's motion, and the parties ultimately reached a stipulation that was introduced into evidence at trial.

sought out the equipment for a jihadist operation he was planning, and because the equipment demonstrates that the defendant's violent plans were not just talk. The equipment evidence is alternatively admissible under Rule 404(b) as highly probative of the defendant's identity, motive, and intent in committing the charged terrorism crimes.

### A. Relevant Facts

Individual-1 is expected to testify that in about 2020 or 2021, when Individual-1 was still residing in the Bronx, he began receiving messages from the defendant requesting that Individual-1 order and ship to the defendant in Albania a variety of tactical items, including a ballistic vest, rifle modifications, and magazine pouches (holsters designed to hold spare ammunition magazines for firearms). The defendant also sent Individual-1 a spreadsheet listing the equipment the defendant wanted, as well as quantities, prices, and links where the equipment could be purchased. The defendant sent Individual-1 money to pay for the purchase of the requested items, and Individual-1 ordered and then stored in his home certain of the requested items. At one point, the defendant suggested that the defendant's mother might pick up the items from Individual-1 if she traveled to the United States, but Individual-1 did not subsequently hear from the defendant's mother. In November 2024, the defendant traveled with his mother from Albania to the United States, where he was arrested on the day of his arrival. Shortly after the defendant's arrest, the FBI collected the defendant's equipment from Individual-1, which included a wetsuit, a riflescope, a red dot sight (which can be used to aim a firearm), and a grip for an AK-47.

### B. Discussion

Evidence of the equipment that Individual-1 ordered and stored at the defendant's direction is relevant and admissible as direct evidence of the charged terrorism offenses. The equipment the defendant sought from Individual-1 were not random hobbyist supplies; they were items the defendant assessed he needed to carry out a terrorist attack. Indeed, he sent messages confirming

as much to CHS-1. Across multiple monikers, the defendant spoke extensively about the tactical gear he needed for his "op," and he asked CHS-1 for help obtaining that equipment on multiple occasions. For example, using the "Despite" moniker on the Conversations application, in or about June 2019, the defendant asked CHS-1 to help him obtain, among other things, a "plate carrier," (a type of body armor), firearm magazine pouches, "rifle modifications such as polymer buttstocks handguatds [sic] optics," a "folding dump pouch," (a collapsible bag that can be worn on a belt or tactical vest for use in storing empty magazines and other items) and a "wetsuit black size large." The defendant explained that the vests he requested were small enough that "you can wear them under your coat in the fall time undetected." In the same "Despite" chat in the Conversations application, the defendant told CHS-1 that "its easy to get ak47s and handguns" but that he needed assistance purchasing the tactical gear.[26]

Similarly, in approximately October 2019, using the Telegram moniker "Battar Nabi," the defendant again asked CHS-1 to procure equipment for him. Specifically, the defendant asked that CHS-1 focus on getting one set of "AKM modifications"[27] for the defendant, and minutes later, asked CHS-1 what his opinion was on a "dc sniper scenario." The defendant elaborated about his planned operation: "And this type of scenario is not executed on one location but many and the targets can be everyday average people in different cities. One day someone gets shot in the capital the next 50miles south in the country side and the next 280miles north at a beach etc. U get the idea panic confusion shock[.]" After describing this attack, the defendant urged CHS-1 to order

[26] In exchange for the tactical gear, the defendant offered to compensate CHS-1 with the defendant's camera, about which the defendant stated, "What good is the camera to me when I am dead?[,]" suggesting that the defendant was prepared to die and recognized the significant risks of the operation he was contemplating.

[27] "AKMs" are Soviet assault rifles, and "AKM" stands for Avtomat Kalashnikova Modernizirovanniy.

the vests he requested from Amazon and similar U.S.-based websites before the United States passed a law requiring a license to purchase vests with "ballistic plates." As part of this same conversation, the defendant sent CHS-1 a list of "Gear/Equipment/Hardware," containing many of the same items on the equipment list the defendant sent to Individual-1. The list the defendant sent to CHS-1 included, among other things, a large wetsuit, medical supplies, combat knives, AKM modifications, a "RedDot" optic, and various firearm grips.

And, in approximately January 2020 in the SOGRU Chat using the moniker "CASEVAC ETA 10MIKS," the defendant told the chat participants that he was getting wetsuits, "red dot optics," and "akm mods" for use in an "op," and asked for the measurements of the other chat participants so he could purchase gear for them as well. The defendant said that there was not enough money for the SOGRU Chat participants to have "side arms," but that there were "ak47s" and he would try to get everyone "moded akms." The defendant told the SOGRU Chat participants that the "op" would take place in "fall or winter," that they would do "specific training before initiation," and that there would be "a high survivability rate for all of us during thr [sic] mission."

The equipment that the defendant requested that Individual-1 procure and that Individual-1 then ordered for the defendant at the defendant's direction included many of the exact items the defendant described in his chat messages as being necessary for his planned attack: optic devices for rifles, a red dot sight, an AK-47 monogrip attachment, a tactical knife set, a folding dump pouch, and a wetsuit, among other items. Thus, the Individual-1 equipment is squarely relevant as direct evidence of the charged terrorism offenses. Not only are the supplies themselves indicative of the defendant's plan and his willingness to carry it out, the lengths the defendant went to in order to obtain these supplies—repeatedly asking CHS-1 and eventually resorting to reaching out to a friend from high school in another country—is highly probative of his intent and motivation

to amass the materials he needed to harm others. Specifically, the equipment is itself a material resource that the defendant procured for himself and for his "brothers"—whom CHS-1 portrayed as members or associates of ISIS—that the defendant intended for himself and for those "brothers" to use in furtherance of an attack, including an attack involving a weapon of mass destruction, a bombing of a public place, and a chemical weapon.

At the same time, the equipment procured by Individual-1 on the defendant's request is direct evidence of—or alternatively, permissible Rule 404(b) evidence of—the defendant's identity. As set forth above, account attribution will be a central issue of this trial. That the defendant discussed the exact same tactical supplies as "Despite," "Battar Nabi," and "CASEVAC ETA 10MIKS" is probative of the person using each of those accounts being the *same person*. That the defendant subsequently contacted an old friend from high school to purchase the exact same supplies for the defendant as discussed in his various online accounts with CHS-1 is probative of the person using each of those accounts being the *defendant*. This is because unlike CHS-1 and the OCE, Individual-1 actually knows the defendant, has spent time with the defendant in person, and is expected to be able to identify the defendant in the courtroom. This is significant evidence of identity, and the equipment Individual-1 purchased for the defendant is the evidentiary throughline.

## VII. <u>Evidence of the Section 2332a Conspiracy Is Admissible</u>

S1 Count One charges the defendant with provision and attempted provision of material support and resources knowing or intending that they are to be used in preparation for, carrying out, or concealing the commission of, a violation of several predicate offenses, including 18 U.S.C. § 2332a, which prohibits using, threatening, and attempting or conspiring to use, a weapon of mass destruction without lawful authority and18 U.S.C. § 2332f, the bombing of places of public use. To prove these predicate offenses, the Government anticipates offering communications involving

Kristopher Matthews, who obtained bomb-making materials from the defendant's InGhimasi Channels and then shared those materials with CHS-2, as part of a conspiracy to use a WMD against multiple federally-owned sites in the United States, including the White House. The Government also intends to offer CHS-2's testimony authenticating these communications and identifying Matthews. Although the defendant was not part of those conversations between Matthews and CHS-2, this evidence is not hearsay and is admissible as evidence (i) that the defendant provided information to individuals, like Matthews, who then used that information to conspire to plot attacks involving a weapon of mass destruction, and (ii) of the defendant's knowledge and intent in supplying Matthews with bomb-making materials.

### A. Relevant Facts

In January 2020, Matthews, a U.S. national and resident, sent CHS-2 portions of the defendant's InGhimasi Channels, including a link to the chat where the defendant had posted the ISIS TATP Video. In subsequent months, Matthews communicated with CHS-2 and a co-conspirator about using explosives to target federal property, such as the White House and the headquarters of the Drug Enforcement Administration and the Federal Bureau of Investigations. The communications show that Matthews was a supporter of ISIS and was motivated to commit jihad.

### B. Applicable Law

#### 1. Rule 803(3)

Under Rule 803(3), a declarant's out-of-court statement expressing a then-existing intent or plan to undertake future conduct is admissible to establish the declarant's state of mind and, where appropriate, that the declarant then acted in accordance with that intent. *See United States v. Best*, 219 F.3d 192, 197 (2d Cir. 2000). For example, a statement by a declarant that he is going to meet with another individual is admissible to show the declarant's future intent, where the

subsequent event is corroborated by independent evidence. *United States v. Badalamenti*, 794 F.2d 821, 825 (2d Cir. 1986). Such statements are admissible regardless of whether the declarant is available to testify.

**2. Third-Party Statements as Circumstantial Evidence**

Third-party statements may be admitted as non-hearsay circumstantial evidence of the defendant's knowledge, intent, or participation in criminal activity, whether or not the defendant was a participant in the conversation. *See United States v. Oguns*, 921 F.2d 442, 448-49 (2d Cir. 1990) (holding that an unidentified caller's question to an agent answering the defendant's phone was admissible as non-hearsay circumstantial evidence of the defendant's knowledge and intent concerning narcotics importation and distribution); *Headley v. Tilghman*, 53 F.3d 472, 477 (2nd Cir.1995) (questions from an unidentified caller to an officer answering defendant's beeper were admissible as non-hearsay circumstantial evidence that the defendant used his beeper to receive requests for drugs, rather than as co-conspirator statements); *United States v. Kohan*, 806 F.2d 18, 21–22 (2d Cir.1986) (statements of third party to defendant about source of checks was not hearsay because they were offered to prove the defendant believed the third-party).

**C. Discussion**

CHS-2's anticipated testimony about Matthews's statements to CHS-2 and Matthews's co-conspirator, and related communications involving CHS-2 and Matthews, are admissible.

*First*, CHS-2's communications with Matthews show that they expressed their intent to undertake certain future actions, and CHS-2's testimony regarding these communications is expected to reflect the same. *First*, CHS-2's communications with Matthews show that he expressed his intent to undertake certain future actions, and CHS-2's testimony regarding these communications is expected to reflect the same. For example, in a January 2020 chat, CHS-2 and Matthews described their plans to meet in a particular state, and CHS-2 is expected to testify

regarding Matthews's stated intent to conduct certain U.S. attacks using explosives. These statements are admissible under Rule 803(3).

*Second*, Matthews's subsequent dissemination and use of the defendant's materials are relevant to establishing the nature and practical utility of those materials—and, in turn, the defendant's knowledge and intent in distributing them. That the recipient used the materials in furtherance of a conspiracy inspired by ISIS and to use a WMD against certain federal buildings in the United States is probative of their practical utility for the criminal purposes the defendant is alleged to have contemplated. *See Abu-Jihaad*, 630 F. 3d at 133-34 (upholding admission of jihadist videos as relevant to understanding the defendant's motive and intent in disclosing classified military information). This is particularly so in a material support case where defendant's intent with respect to the individuals being supported is part of the essential elements of the offense. Matthews's statements supporting ISIS and planning to commit terrorist offenses—in other words, that a recipient of the defendant's material support actually sought to commit the predicate acts—is highly probative of the defendant's guilt. Notably, the Government does not seek to impute the recipient's intent to the defendant. Rather, the recipient's conduct and use of the defendant's materials is circumstantial evidence bearing on the character of the materials the defendant supplied, which the jury may consider alongside the defendant's own statements and conduct in assessing the defendant's intent in disseminating them.

*Lastly*, the statements of present intent are not subject to exclusion under Rule 403. They are highly probative of the declarants' intentions and plans to commit the contemplated offenses, which are directly relevant to the nature and intended use of the bomb-making materials that Matthews received from the defendant's Telegram channel. *See Best*, 219 F.3d 198-99 (recognizing that statements of present intent are probative of subsequent conduct). The fact that

the statements describe serious criminal conduct do not render them *unfairly* prejudicial, because they are offered to establish the declarants' own contemporaneous intentions and plans rather than the truth of allegations regarding the defendant's conduct. Accordingly, their substantial probative value is not substantially outweighed by any danger of unfair prejudice, confusion, or misleading the jury under Rule 403.

## VIII. <u>The Defendant Cannot Admit His Own Statements Absent a Hearsay Exception or Other Evidentiary Basis</u>

The Court should closely police any attempts by the defendant to introduce his own self-serving hearsay statements. "[W]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *see also United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) (similar). To the extent the defendant argues that his statements are admissible as a declaration of her then-existing state of mind under Rule 803(3) of the Federal Rules of Evidence, that hearsay exception applies only to statements that "face forward, rather than backward." *United States v. DiMaria*, 727 F.2d 265, 271 (2d Cir. 1984); *United States v. Blake*, 195 F. Supp. 3d 605, 610-11 (S.D.N.Y. 2016) (precluding a defendant from introducing her own out-of-court statements to law enforcement officers in which she pointed the finger at co-defendants as reflecting a then-existing state of mind because such statements reflected a "self-serving explanation of past events"); *United States v. Whitehead*, No. 22 Cr. 692 (LGS), 2024 WL 659940, at *1 (S.D.N.Y. Feb. 16, 2024) (noting that defendant's own statements as offered by the Government are not hearsay under Rule 801); *United States v. Dinga*, 609 F.3d 904, 908-09 (7th Cir. 2010) (affirming the rejection of a defendant's attempt to introduce evidence of his offer to take a polygraph after his arrest). "[T]o fall within Rule 803(3)'s 'state of mind' hearsay exception, the statements sought to be introduced must relate to the declarant's state of mind during the [illegal conduct]" and not what the declarant

"said or did after the [illegal conduct] had taken place and as the scheme itself was being discovered." *United States v. Netschi*, 511 F. App'x 58, 61 (2d Cir. 2013) (affirming district court's exclusion of statements the defendant "made and reactions he had concerning the unraveling of the scheme"). For that reason, "self-serving explanation[s] of past events" are not admissible under Rule 803(3). *Blake*, 195 F. Supp. 3d at 610.

Nevertheless, under Rule 106 of the Federal Rules of Evidence, there are certain instances in which a defendant may require the admission of certain portions of a statement when the Government offers excerpts of a statement under the so-called "rule of completeness." However, Rule 106 "does not render admissible evidence that is otherwise inadmissible." *United States v. Terry*, 702 F.2d 299, 314 (2d Cir. 1983). Thus, the rule of completeness requires admission of a hearsay statement only when the statement is "necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007). "The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999); *see also United States v. Gonzalez*, 399 F. App'x 641, 645 (2d Cir. 2010) ("[T]he rule of completeness is not a mechanism to bypass hearsay rules for any self-serving testimony.").

The defendant should be precluded from introducing his own prior statements for the truth of the matter asserted, absent a hearsay exception or a showing that specific portions are required under the rule of completeness. Here, the Government anticipates introducing the defendant's own statements at trial as evidence of the charged conduct. These statements include, by way of example, those made by the defendant over encrypted messaging applications to CHS-1, OCE,

and others. The defendant also made statements to CBP upon his arrival in the United States from Albania on November 21, 2024 and to FBI agents shortly after his arrest the same day. To the extent that the defendant seeks to introduce portions of his own statements from chats or interviews, the Court should police the well-settled rule that a defendant is entitled to offer his own statements only if they fall within a hearsay exception, *see Blake*, 195 F. Supp. 3d at 610-11, or they are needed to explain admitted statements or put those statements into context, *see Johnson*, 507 F.3d at 796.

## IX. **The Court Should Preclude Cross-Examination on the Unrelated Investigative Work of the OCE and CHSes**

The Government anticipates calling CHS-1, CHS-2, and the OCE to testify about their respective interactions with the defendant.[28] In addition to working in a source and undercover capacity in this investigation, the CHSes and OCE have also worked under aliases in other national security-related cases, and both CHS-1 and CHS-2 continue to do so. The Government moves to preclude cross-examination of the CHSes and OCE at trial about their respective involvement in unrelated investigations.

Courts in this District have repeatedly recognized that such questioning is generally irrelevant to the charged conduct under Rule 402, and the probative value of such information is substantially outweighed by the danger of confusing the issues and undue delay. *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 491 (S.D.N.Y. 2018) (precluding cross-examination of undercover agents regarding unrelated investigations based on Rules 402 and 403, and permitting the defense to seek reconsideration upon a specific showing of relevance); *United States v.*

[28] The Government is separately moving for additional time to file a motion seeking protective measures for the CHSes and the OCE who will testify at trial, including to preclude the defense from eliciting the CHSes' and the OCE's identifying information.

*Hossain*, No. 19-CR-606 (SHS), 2021 WL 4272827, at *6 (S.D.N.Y. Sept. 21, 2021) (precluding cross-examination on the CHSes' other investigations under Rule 403).

In addition, under Rule 611(b), "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." *See also United States* v. *Rivera*, 971 F.2d 876, 886 (2d Cir. 1992) (quoting Fed. R. Evid. 611(b)); *United States v. Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989) (affirming trial court's limitation of cross-examination of case agent to those subjects on which the agent testified); *United States v. McLaughlin*, 957 F.2d 12, 18 (1st Cir. 1992) ("[A] party has no right, unless the court in the exercise of its discretion allows, to cross-examine a witness beyond the subject matter of his direct examination and beyond matters affecting credibility.").

Lastly, "cross-examination may be curtailed to accommodate other, legitimate interests at trial." *United States v. Sterritt*, No. 21 Cr. 193 (KAM), 2023 WL 7386660, at *11 (E.D.N.Y. Nov. 8, 2023). The requested restrictions would serve the Government's legitimate interest in protecting the integrity of other FBI investigations and the sensitive activities currently being undertaken by the CHSes as part of those investigations.

Accordingly, absent a particularized showing that the participation of the CHSes and OCE in another investigation bears on a material issue or provides a legitimate basis for impeachment, this work is unrelated to their involvement in the instant case and cross examination on those subjects should be precluded.

## X. Evidence or Argument Concerning the Punishment or Consequences the Defendant Will Face If Convicted Should Be Precluded

Evidence or argument concerning the possible consequences of conviction should be precluded. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v.*

*United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* There is no proper basis for the defendant to put issues of potential punishment before the jury in any form, and the defendant should not be permitted to offer evidence or argument inviting the jury to consider them, whether directly or indirectly. *See, e.g.*, *United States v. Avenatti*, No. 19 Cr. 374 (JMF) (S.D.N.Y. Jan. 13, 2022) (Dkt. 288) (Tr. 9-10) ("anything that adverts to possible punishments, including possibility of incarceration, however obliquely, is improper and will not be permitted," including, for example, a statement in opening or closing arguments that the defendant's "liberty is at stake," which would be "a not-so-thinly-veiled reference to the prospect of incarceration, which is altogether improper"). Any evidence or argument concerning such consequences should accordingly be precluded.

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated: New York, New York
November 10, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: s/
Jane Y. Chong
Chelsea L. Scism
Assistant United States Attorneys
212-637-2263 / -2105